**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CARL STRIMPEL, | ) | CASE NO. 1:12-cv-406 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Carl Strimpel ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying his

applications for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a), and for Period of Disability ("POD") and

Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 416(i), 423.

This case is before the undersigned United States Magistrate Judge pursuant to the

consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the

reasons set forth below, the Commissioner's final decision is AFFIRMED.

**I.    PROCEDURAL HISTORY**

On October 30, 2008, Plaintiff filed his applications for SSI, POD and DIB and

alleged a disability onset date of March 8, 2008.  (Transcript ("Tr.") 98.)  The application

was denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.*)  On September 2, 2010, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") and medical expert ("ME") also participated and testified.  (*Id.*)  On May 10, 2011, the ALJ found Plaintiff not disabled.  (Tr. 110.)  On December 19, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On February 19, 2012, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  On July 3, 2012, Plaintiff filed his Brief on the Merits.  (Doc. No. 14.)  On August 16, 2012, the Commissioner filed his Brief on the Merits.  (Doc. No. 15.)  Plaintiff did not file a reply brief.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ erred in failing to proffer evidence admitted into the record after Plaintiff's hearing to the medical expert, and failed to account for the impact of that evidence on Plaintiff's RFC.   The Commissioner responds that the ALJ did not err.

## II.    EVIDENCE AND RELEVANT POST-HEARING PROCEDURAL HISTORY

### A.    Personal and Vocational Evidence

Plaintiff was 35 years old on his alleged disability onset date.  (Tr. 108.)  He had a limited education, as he testified that he completed the eleventh grade. (*Id.*)  He had past relevant work as a security guard.  (*Id.*)

### B.    Medical Evidence Submitted Before Plaintiff's Hearing[1]

### 2.    Treating Providers

On March 10, 2008, Plaintiff sought treatment from the emergency department at Lakewood Hospital, complaining of low back pain and spasms caused when he fell as he was exiting his truck at work.[2]  (Tr. 259.)  An x-ray of Plaintiff's lumbar spine revealed no abnormalities, and he was diagnosed with lumbosacral strain.  (Tr. 268, 264-66.)  The attending physician prescribed Plaintiff Naprosyn, Robaxin and Ultracet.  (Tr. 265-66.)

On March 12, 2008, Plaintiff's employer sent him to On the Clock Care at Medina General Hospital for further evaluation.  (Tr. 457.)  He was examined by Jamie Kirby, RN, MSN, CNP.  (*Id.*)  Nurse Kirby noted that Plaintiff, who complained of pain rating 6 out of 10 and back spasms radiating into his legs, was uncomfortable during the exam, and demonstrated significant tenderness over his paraspinal muscles of L1-L5.  (*Id.*)  Plaintiff's forward flexion was limited to 30 degrees, and he had full extension. (*Id.*)  Rotation and lateral bending (right and left) were limited at the end range of motion and caused significant pain.  (*Id.*)  Nurse Kirby diagnosed Plaintiff with lumbar strain, and instructed him to attend  three sessions of physical therapy per week and to

---

[1]    Evidence in the record refers to Plaintiff experiencing depression and chest pains, each of which the ALJ concluded was not severe.  (Tr. 101.)  Plaintiff does not challenge these conclusions in his Brief.  Accordingly, the medical evidence discussed herein relates only to Plaintiff's back injury.

[2]    The records from Lakewood Hospital reflect that Plaintiff reported to the staff there that he had fallen out of his truck approximately one hour before he arrived at the emergency department via EMS at 7:00 AM on March 10, 2008.  (Tr. 259.)  Other record evidence, including statements at his hearing, reflects that he fell out of his truck on March 8, 2008. (Tr. 12, 187.)

3

return in one week. (*Id.*)

On March 26, 2008, after missing his previous appointment, Plaintiff reported to Nurse Kirby that his pain was 10 out of 10, and that he was experiencing "excruciating" muscle spasms and pain centralizing to the right side of his lumbar spine.  (Tr. 456.) Examination revealed significant tenderness over the L1-L5 paraspinal muscles, improved forward flexion and full extension.  (*Id.*)  Plaintiff was able to squat and rise slowly, and his rotation and lateral bending (right and left) appeared full but were limited at the end range of motion due to pain.  (*Id.*)  His straight-leg raise was positive for radicular symptoms on the right, and his bilateral lower extremity strength was weakened due to back pain.  (*Id.*)  Nurse Kirby referred Plaintiff for an MRI to rule out disc herniation, refilled his medications, and instructed him to continue physical therapy. (*Id.*)

On April 2, 2008, Plaintiff complained to Nurse Kirby that he was not improving, and that he continued to experience back spasms that brought him "to his knees."  (Tr. 455.)  Nurse Kirby noted that he was scheduled for an MRI the next day, and planned to adjust Plaintiff's therapy based on the results of that test.  (*Id.*)  The April 3, 2008 MRI revealed a small left paracentral herniated nucleus pulposus at L4-L5 mildly compressing the L5 nerve root.  (Tr. 462.)  On April 9, 2008, Nurse Kirby noted that Plaintiff complained of pain rating 6 out of 10, and indicated that she was requesting approval from the Bureau of Worker's Compensation ("BWC") for a consult with a spinal specialist.  (Tr. 454.)

On April 23, 2008, Nurse Kirby noted that Plaintiff had cancelled or "no showed"

4

for multiple physical therapy appointments.  (Tr. 453.)  Examination revealed tenderness in the midline through the entire lumbar region as well as paraspinous, and slight tenderness over the sacroiliacs bilaterally.  (*Id.*)  Plaintiff was able to flex forward to put his hands at his knees, and walked with a flat-footed shuffling gait.  (*Id.*) On May 1, 2008, Nurse Kirby again noted Plaintiff's failure to consistently attend his physical therapy appointments, and instructed him to do so.[3]  (Tr. 452.)  She observed that he remained tender over the sacroiliacs bilaterally, and that he complained of pain rating 8 out of 10.  (*Id.*)

On May 15, 2008, Nurse Kirby noted that, during the previous week, Plaintiff had been examined by a spinal specialist, who opined that surgical intervention was not necessary and recommended that Plaintiff seek a pain management consultation.[4]  (Tr. 451.)  Nurse Kirby observed that Plaintiff's attendance at physical therapy had improved, and that he was complaining of pain rating 6 out of 10.  (*Id.*)  Examination revealed continued decreased forward flexion and tenderness over the sacroiliacs bilaterally.  (*Id.*)  Nurse Kirby indicated that she would request approval for further physical therapy and a pain management consultation, and instructed Plaintiff to follow up in two weeks.  (*Id.*)

On May 29, 2008, Plaintiff reported to Nurse Kirby that he was experiencing pain

---

[3]  The records from Plaintiff's physical therapy reflect that he frequently cancelled or failed to attend his appointments, and that he occasionally arrived late or left early.  (Tr. 356, 359, 362, 365, 367, 371, 384, 387.)

[4]  A progress note from Adrian M. Zachary, D.O., who treated Plaintiff in 2010, reflects that Plaintiff consulted with him in 2008.  (Tr. 678.)  However, Dr. Zachary's records from 2008 are not included in the administrative transcript.

rating 8 out 10, and back spasms when upright.  (Tr. 450.)  Nurse Kirby observed that

Plaintiff moved slowly about the room, but demonstrated improved flexion and

extension.  (*Id*.)  Plaintiff experienced pain on palpitation of his paraspinal muscles, and

"considerable" pain on right lateral bending.  (*Id*.)  On June 19, 2008, Nurse Kirby noted

that Plaintiff's physical therapist had recommended that Plaintiff, who had not been

working because his employer had no light duty work available, attempt to return to full

time work.  (Tr. 449.)  Nurse Kirby observed that Plaintiff was uncomfortable with the

suggestion, as he continued to suffer from back spasms.  (*Id*.)  Nurse Kirby also noted

that Plaintiff had consulted with a pain management specialist, who had recommended

further unspecified options to address Plaintiff's back pain.[5]  (*Id*.)  Plaintiff had not

decided whether he would pursue any of the recommendations.  (*Id*.)  On July 3, 2008,

Nurse Kirby reported that Plaintiff had elected to initiate work conditioning, and had

decided against pursuing any pain management therapies.  (Tr. 448.)  Plaintiff was

experiencing pain, which he rated at 8 out of 10, during and after the work conditioning.

(*Id*.)

On August 6, 2008, Plaintiff was examined at On the Clock Care by Francine

Terry, M.D., who observed that Plaintiff was tender in the midline from the

thoracolumbar junction through the base of the sacrum.  (Tr. 446.)  Dr. Terry noted that

Plaintiff had a normal gait, and was able to flex forward to put his hands just slightly

above knee level.  (*Id*.)  Dr. Terry opined that Plaintiff had attained maximum medical

improvement, and completed a prescription for vocational assessment and job search

---

[5]   The records from the pain management specialist are not included the
transcript of the administrative proceedings.

assistance.  (*Id*.)  In a Work Ability Report for the BWC, Dr. Terry reported that Plaintiff had the following permanent restrictions: occasional lifting/carrying of up to 35 pounds, occasional pushing/pulling of 25 to 30 pounds, one-hand carrying of up to 15 pounds, no lifting more than 25 pounds above his shoulders, and no squatting or kneeling.  (Tr. 447.)

Plaintiff returned to Dr. Terry on November 10, 2008, complaining that his back was "killing him" and reporting that he and his attorney were pursuing permanent total disability benefits through the BWC.  (Tr. 444.)  Dr. Terry observed, "At this point, I have absolutely nothing more to offer" Plaintiff, as he had failed to consistently attend physical therapy, work conditioning and vocational rehabilitation.  (*Id*.)  A cursory exam revealed no gross focal neurologic deficits in Plaintiff's lower extremities.  (*Id*.)  Dr. Terry refilled Plaintiff's prescriptions for Naprosyn and Flexeril.  (*Id*.)

## 2.  Agency Assessments

On February 6, 2009, state agency physician W. Jerry McCloud, M.D., reviewed the medical evidence to assess Plaintiff's physical RFC.  (Tr. 563-70.)  Dr. McCloud opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hour during an eight-hour workday; sit for six hours during an eight-hour workday; and push/pull consistent with his ability lift and carry.  (Tr. 564.)  He also determined that Plaintiff could never climb ladders, ropes or scaffolds, and that Plaintiff was limited to frequently stooping and occasionally crouching.  (Tr. 565.)  Dr. McCloud found no restrictions with respect to Plaintiff's manipulative, visual, communicative or environmental limitations.  (Tr. 566-67.)  On May 8, 2009, state agency physician

William Bolz, M.D., affirmed Dr. McCloud's assessment.  (Tr. 616.)

### C.     Hearing Testimony and Subsequent Procedural History

#### 1.     Plaintiff's Hearing Testimony

Plaintiff testified as follows at his administrative hearing:

From August through December 2009, he had worked unloading trucks at Chick Master in Medina, a position that required him to operate a tow motor, as well as lift and carry by hand boxes weighing over 50 pounds.  (Tr. 18-19.)  In May 2010, he had worked for three days at a cement company, placing cables on large cement slabs to be lifted by a crane, positioning pieces of wood used in stacking the slabs, and pouring and painting support beams.  (Tr. 21-27.)  He quit after three days because his back pain was too severe to continue.  (Tr. 27-28.)

Plaintiff had three children – two teenage daughters and a teenage son.  (Tr. 28-29.)  He lived with his 16-year old son and a friend.  (Tr. 29.)  Each day, he woke his son up and took him to school.  (Tr. 29.)  Plaintiff mowed the lawn about once each month, but needed help getting out of bed the next day.  (Tr. 30-31, 40.)  He and his son tried to do most of the chores around the home because Plaintiff's friend was allowing him to live there for free.  (Tr. 29-30.)  Plaintiff drove himself to most of his medical appointments.  (Tr. 31.)  He prepared quick meals that allowed him to alternate between sitting and standing at the stove.  (Tr. 39-40.) Plaintiff had contemplated looking for work, and applying at McDonald's, but was concerned that he would not be able to stand for a sufficient period of time to perform the work.  (Tr. 38-39.)  He believed that he could perform a job that would allow him to sit and move around when

8

he needed to.  (Tr. 39.)

Plaintiff spent most of his day trying to relax, as he suffered back spasms that radiated into his leg.  (Tr. 31.)  If he performed any long or strenuous activity, his lower back turned black and blue.  (Tr. 33.)  He and his son occasionally visited Plaintiff's parents at the campground where his parents lived.  (*Id*.)  He attended his son's karate lessons, and occasionally threw a football with his son, but generally had to stop because his back would begin hurting.  (Tr. 34.)  His back spasms interfered with his sleep, causing him to wake up three to four times each night.  (Tr. 35.)  Plaintiff would take a prescription muscle relaxer when the pain grew too severe, but otherwise attempted to treat his pain with over the counter medications.  (Tr. 36-37.)  He performed physical therapy exercises at home when he felt well enough to do so, approximately three days per week.  (Tr. 45-47.)

### 2.    Medical Expert's Hearing Testimony

Based on his review of the records in evidence at the time of the hearing, Dr. Cox opined that Plaintiff had a herniated disc at L4-L5, but did not believe that Plaintiff had received consistent or substantial treatment for that injury.  (Tr. 53-55.) Specifically, Dr. Cox noted that Plaintiff had not received epidural injections from a pain management specialist, which would have likely provided him with some relief.  (Tr. 54-55.)  Dr. Cox believed that Plaintiff had "not taken advantage of his medical team."  (Tr. 55.)  He stated that there were no MRIs in the record that he could use to ascertain the condition of the disc at L4-5, or the nerve apertures.  (Tr. 55-56.)

Dr. Cox opined that Plaintiff could perform light or sedentary work, but observed that he did not have enough information to determine that Plaintiff was disabled.  (Tr.

9

56-57.)  Based on his education, experience and training, as well as his review of the medical records, Dr. Cox concluded that Plaintiff did not have a medical impairment or combination of impairments that met or equaled Medical Listing 1.04, which set forth the criteria for disorders of the spine.  (Tr. 59.)  According to Dr. Cox, Plaintiff could lift a maximum of 25 pounds; could lift ten pounds frequently; could sit and/or stand for six hours in an eight-hour workday; and could occasionally climb while avoiding ladders, scaffolds and dangerous machinery. (Tr. 59-61.)

Plaintiff's counsel pointed out that Plaintiff had undergone an MRI in April 2008, and, after reviewing the report from that MRI, Dr. Cox testified that the results of that MRI did not change his opinion regarding Plaintiff's limitations.  (Tr. 63, 68-70.)  During Dr. Cox's questioning by Plaintiff's counsel, it became apparent that  Plaintiff had undergone treatment after November 2008 – the last date of treatments in the records before the ALJ – that was not reflected in the medical records available at the time of the hearing.  (Tr. 63-66, 69-72.)  Plaintiff explained that, since November 2008, he had undergone three epidural steroid injections, obtained a second MRI and consulted with a spinal surgeon who opined that he was not a candidate for surgery.  (Tr. 63-36.)  Plaintiff's counsel noted that at least one of Plaintiff's treating physicians had failed to respond to releases and requests for records, and agreed to obtain Plaintiff's most recent medical records and provide them to the ALJ.  (Tr. 66.)

### 3.    Vocational Expert's Hearing Testimony

The ALJ posed the following hypothetical to the VE:

> [L]ight functional limitations, lifting up to 20 pounds occasionally and lifting up to 10 pounds frequently. . . . [S]tanding and walking for about six hours, sitting for up to six hours in an

10

> eight-hour day with normal breaks. [F]requently climbing ramps
> and stairs; occasionally climbing ladders, ropes, scaffolds;
> frequent balancing; frequently stooping, kneeling, crouching and
> crawling; and . . . avoiding all hazardous machinery and
> unprotected heights.

(Tr. 82-83.)  The VE opined that the individual described in the ALJ's hypothetical could

perform Plaintiff's past relevant work as a security guard.  (Tr. 83.)

### 4.    Post-Hearing Procedural History

On November 22, 2010, the ALJ notified Plaintiff that he proposed to enter

medical records received after the hearing[6] as additional evidence in the record.  (Tr.

251.)  The ALJ advised Plaintiff that he was permitted to submit written responses –

including comments or a statement regarding the evidence – and that he could request

a supplemental hearing regarding the additional evidence.  (*Id*.)  The ALJ informed

Plaintiff that, if he requested a supplemental hearing, Plaintiff could question witnesses

and request that the ALJ subpoena witnesses to appear at the hearing.  (*Id*.)  Plaintiff

did not respond.

### D.    Post-Hearing Medical Evidence

The medical records entered into evidence after Plaintiff's administrative hearing

consisted of the following:

On February 8, 2010, Plaintiff returned to On the Clock Care, where he was

examined by Nurse Kirby.  (Tr. 672.)  He reported to Nurse Kirby that, with the

exception of a single visit to a chiropractor, he had not sought treatment for his back

since his November 2008 appointment.  (*Id*.)  She noted that he continued to have

---

[6]    These exhibits are at pages 655-689 in the transcript, and generally cover the
treatment received by Plaintiff after November 2008.

difficulty with his range of motion in the lumbar spine, and that he complained of severe symptoms that had interfered with his ability to work. (*Id.*) Nurse Kirby refilled his medications, and explained that pain management remained an option, and Plaintiff agreed to consider it. (*Id.*)

On February 24, 2010, Plaintiff was examined by pain management specialist Terence Ross, M.D., who noted Plaintiff's pain, muscle spasms and numbness, as well as muscle tightness. (Tr. 653.) On March 8, 2010, Dr. Ross performed a lumbar epidural steroid injection. (Tr. 652, 666-68.) Plaintiff received additional epidural steroid injections on March 15, 2010 and March 22, 2010. (Tr. 651, 658, 660, 663.)

On March 25, 2010, Nurse Kirby noted that Plaintiff continued to experience a decreased range of motion, and complained of pain rating 5 out of 10 and radiating into his right leg. (Tr. 671.) Plaintiff stated that the epidural steroid injections had not decreased his pain. (*Id.*)

On April 16, 2010, spinal specialist Adrian Zachary, D.O., examined Plaintiff, noting Plaintiff's complaint that his pain was worse than two years before, and that his right leg was getting weaker. (Tr. 678.) Plaintiff reported that his pain increased with prolonged sitting and with walking, and that he had to change positions frequently when sitting. (*Id.*) Dr. Zachary diagnosed Plaintiff with degeneration of a lumbar or lumbosacral invertebral disc, lumbago, and thoracic or lumbosacral neuritis or radiculitis, and ordered a lumbar MRI. (*Id.*) A May 3, 2010 MRI revealed degenerative interspace changes at L2-3 and L4-5, posterior lateral disc protrusion to left L4-5 with mild effect on the thecal sac, and posterior element degenerative changes at L4-S1. (Tr. 681-82.) On May 21, 2010, Dr. Zachary diagnosed Plaintiff with displacement of

12

lumbar intervertebral disc without myelopathy and, at Plainitff's request, referred him to a surgeon.  (Tr. 683.)

On July 7, 2010, Plaintiff was examined by spine surgeon Thomas Mroz, M.D. (Tr. 673.)  Plaintiff complained of deep, stabbing, aching pain that began in the lower back and radiated into the right leg, as well as intermittent numbness.  (*Id*.)  Dr. Mroz diagnosed Plaintiff with low back pain, right leg pain and mild degenerative disc disease.  (Tr. 675.)  He opined that Plaintiff was not a surgical candidate.  (*Id*.)

On July 13, 2010, Plaintiff reported to Nurse Kirby that Dr. Mroz had opined that his back problems were the result of arthritis, and would resolve if he lost weight and stopped smoking.  (Tr. 670.)  Plaintiff rated his pain as 9 out of 10.  (*Id*.)  Examination revealed that Plaintiff continued to have a decreased range of motion, as well as a decrease in deep tendon reflexes on the right side.  (*Id*.)  Nurse Kirby and Robert Ostendorf, M.D., completed a Work Ability Report, opining that Plaintiff had attained maximum medical improvement, and had the following permanent restrictions: occasional lifting/carrying of up to 35 pounds, occasional pushing/pulling of 25 to 30 pounds, no lifting more than 25 pounds above his shoulders, and no squatting or kneeling.  (Tr. 645-46.)

On August 9, 2010, Nurse Kirby and Dr. Ostendorf completed a physical capacity assessment, noting that Plaintiff had the following restrictions: occasional lifting of 35 pounds, standing for four hours in an eight-hour workday; sitting for four hours in an eight-hour workday; rarely or never stooping, crouching, crawling or kneeling; occasionally climbing; occasionally pushing/pulling 25 pounds; never moving machinery, additional rest during an eight-hour workday; and a sit/stand option.  (Tr.

13

648-49.)  The assessment reflected that Plaintiff experienced moderate pain.  (Tr. 649.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his

14

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Act through June 30, 2014.

2. The claimant engaged in substantial gainful activity during the following periods: August 2009 to December 23, 2009.

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4. The claimant has the following severe impairments: herniated lumbar disc causing back pain and shooting pain into the legs, vertigo and obesity.

5. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

6. After consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity ("RFC") to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). The claimant is limited to frequent lifting of up to 10 pounds and occasional lifting of up to 20 pounds. He is limited to standing and walking for up to 6 hours in an 8-hour workday and sitting up to 6 hours in an 8-hour workday, with normal breaks. He is limited to frequent climbing of ramps and stairs, and occasional climbing of ladders, ropes and scaffolds. He is limited to frequent balancing, stooping, kneeling, crouching and crawling. He must avoid all hazardous machinery and unprotected heights.

7.    The claimant is capable of performing past relevant work as a
      security guard.  This work does not require the performance of work-
      related activities precluded by the claimant's residual functional
      capacity.

8.    The claimant has not been under a disability, as defined in the Act,
      from March 8, 2008, through the date of this decision.

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made

pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in

the record to determine if the ALJ's decision is supported by substantial evidence,

regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court

does not review the evidence *de novo*, make credibility determinations, or weigh the

evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.

1989).

The Commissioner's conclusions must be affirmed absent a determination that

the ALJ failed to apply the correct legal standards or made findings of fact unsupported

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a

preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by

16

substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignments of Error

According to Plaintiff, remand is necessary in this case because, in failing to ascertain whether the later-submitted evidence altered Dr. Cox's opinion regarding Plaintiff's condition and limitations, the ALJ "usurped" Dr. Cox's role as a medical expert, and improperly relied on his own interpretation of the evidence to determine Plaintiff's RFC.  Further, according to Plaintiff, the ALJ's opinion is not supported by substantial evidence because he determined Plaintiff's RFC based upon an incomplete record – i.e., one missing Dr. Cox's opinion regarding the additional medical records.

The Commissioner responds that Plaintiff's argument lacks merit because, despite being given the opportunity to do so, Plaintiff failed to request a supplemental hearing at which he could have adduced testimony from Dr. Cox regarding the additional medical records.  Further, the ALJ was not required to rely on only Dr. Cox's opinion in formulating Plaintiff's RFC, but, rather, was permitted to independently craft Plaintiff's RFC based on the entire record.  Finally, according to the Commissioner, substantial evidence in the record supports the ALJ's determination of Plaintiff's RFC and, thus, remand is not necessary in this case.

Plaintiff's arguments are not well taken.  As a preliminary matter, the absence of Dr. Cox's opinion regarding the additional medical records is the result of Plaintiff's failure to request his testimony at a supplemental hearing, despite being advised by the

17

ALJ that Plaintiff could do so.[7]  It is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], *when the claimant is proving the extent of his impairments*.") (emphasis added).  To the extent that Plaintiff argues that Dr. Cox's testimony regarding the additional medical records was necessary to accurately formulate his RFC, because Plaintiff failed to adduce that testimony from Dr. Cox, Plaintiff failed to sustain his burden of establishing the impairments that determine his RFC.

Plaintiff further argues that the ALJ's decision to determine his RFC without any further opinion from Dr. Cox was akin to the ALJ interpreting raw medical data and formulating an RFC without the benefit of medical opinion evidence.  He relies on *Deskin v. Comm'r of Social Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), to support his argument.  In that case, the Court reversed and remanded the ALJ's decision denying the claimant's application for benefits because the transcript contained no opinion from

---

[7]  In his Brief, Plaintiff asserts that he was not given the opportunity to examine or challenge any post-hearing medical reports, or to cross-examine the physicians who authored them.  (Pl. Br. at 9.)  The record contains no evidence that the ALJ obtained any further opinion from Dr. Cox or any other medical expert after receiving Plaintiff's updated medical records.  Further, as discussed above, the ALJ's letter – which was sent to the address of Plaintiff's counsel and clearly identified Plaintiff's application as its subject – advised Plaintiff of his opportunity to request a hearing and call Dr. Cox as a witness. (Tr. 251.)

18

a treating source, and only a single opinion from a state agency reviewing physician, which was based on an incomplete medical record.  *Id*. at 912 ("An ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result, an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.").  As a preliminary matter, a claimant's RFC is for the ALJ to determine, *see* 20 C.F.R. § 416.945(a); and *Deskin* "is not representative of the law established by the legislature, and [as] interpreted by the Sixth Circuit Court of Appeals."  *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (Nugent, J.).  Further, in this case, unlike *Deskin*, the decision makes it clear that the ALJ relied on the assessments of several medical sources, both treating and non-treating, in determining the Plaintiff's RFC, as the ALJ cited to reports regarding Plaintiff's limitations prepared by Drs. Terry and Ostendorf and by state agency physicians.  (Tr. 106-07.)  In other words, unlike *Deskin*, this is not an instance in which the ALJ interpreted medical records without the assistance of medical opinions regarding the claimant's capabilities.

Further, there is no merit to Plaintiff's argument that, because the ALJ failed to obtain Dr. Cox's opinion regarding the additional medical records, his decision is unsupported by substantial evidence.  To support this argument, Plaintiff asserts that the ALJ "premised" his RFC determination on Dr. Cox's testimony, which, according to Plaintiff, was based on an "incomplete" medical record.  This is not an accurate description of the ALJ's decision.  Although the ALJ gave Dr. Cox's opinion regarding Plaintiff's limitations "considerable weight," that opinion was not the sole basis for the ALJ's conclusion.  Rather, the ALJ cited to the reports prepared by Drs. Terry and

Ostendorf, including one report prepared by Dr. Ostendorf in August 2010, after Plaintiff sought the treatment described in the additional medical records.  (Tr. 107.)  The ALJ also cited to the opinions of two state agency reviewing physicians.  (*Id*.)

Moreover, the ALJ did not adopt Dr. Cox's opinions outright.  Rather,  the ALJ gave "little weight" to Dr. Cox's opinion that Plaintiff's condition was not severe, noting that, at the time that Dr. Cox offered that opinion, he had not reviewed Plaintiff's April 2008 MRI and did not know that Plaintiff had undergone three epidural steroid injections.  (Tr. 107.)  Similarly, the ALJ rejected Dr. Terry's opinion that Plaintiff could perform work at a level that was equivalent to medium exertion, noting that Dr. Terry's opinion "may reflect the fact that her assessment was performed in August 2008, without the benefit of multiple MRI studies and knowledge of failed pain management attempts." (Tr. 106.)  Finally, in according considerable weight to Dr. Cox's opinion regarding Plaintiff's limitations, the ALJ noted – correctly – that Dr. Cox had reviewed Plaintiff's April 2008 MRI, observed Plaintiff during the hearing, and listened to Plaintiff testify regarding his daily activities and  the treatment and prognoses he received after November 2008.  (Tr. 107-08.)  In other words, in assessing the weight accorded to a source's opinions, the ALJ considered whether and to what extent that source had knowledge of Plaintiff's post-November 2008 medical treatment.  Absent a more specific argument from Plaintiff explaining how the additional medical records would have altered Dr. Cox's opinions, his argument that the ALJ's decision was not supported by substantial evidence lacks merit.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*

U.S. Magistrate Judge

Date:  September 14, 2012